UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INSTITUTE FOR CREATION RESEARCH | § | |
| GRADUATE SCHOOL, | § | CIVIL ACTION |
| plaintiff, | § | |
| v. | § | **No. 3:09-CV-00693-B** |
| RAYMUND PAREDES, et al., | § | |
| defendants. | § | |

## PLAINTIFF'S 1ST AMENDED COMPLAINT,
### AMENDED PER JOINT STATUS REPORT OF 5-21-2007

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Comes now plaintiff, **Institute for Creation Research Graduate School ("ICRGS")**, an

unincorporated educational ministry unit of The Institute for Creation Research, a California not-

for-profit corporation, and hereby submits its 1st Amended Complaint, pursuant to ¶ 5 on page 2

of the Joint Status Report herein:

### I.  PROCEDURAL INTRODUCTION

1.      This civil rights case seeks injunctive and declaratory relief, not damages. It is related to

another suit (which other suit also includes the Texas Higher Education Coordinating Board as a

named defendant) that was originally filed in Travis County's 126th District Court as Cause # D-

1-GN-09-001239, and was removed by defendants (to the federal district court in Austin) on

May 13th, 2009, now pending there as Civil Action # 1:09-CV-382-SS.

2.      In particular, this amended pleading drops all of the "individual capacity" aspects of the

Original Complaint, due to case law developments (occurring after the Original Complaint was

filed herein) that have undermined the likelihood that this lawsuit should include such features.

In other words, this lawsuit now only involves "official capacity" claims against defendants.

3.      There is no "surprise" to the contents of ICRGS's petition pending (as "Petition for Contested Case Status" # 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) in the State Office of Administrative Hearings (SOAH), so that SOAH petition is hereby incorporated by reference as if attached as an exhibit hereto.

## II.  PARTIES, JURISDICTION, & VENUE

4.      Plaintiff ("ICRGS") is an unincorporated educational ministry unit of The Institute for Creation Research, a California nonprofit corporation.  ICRGS is a graduate school that has operated since 1981, offering Master of Science degrees (in accordance with California law) from a Biblical scientific creationist viewpoint.   In short, that viewpoint is notable for recognizing scientific evidences of the worldwide flood described in Genesis 6-9, and scientific evidences of a relatively "young" universe, and scientific evidences of a relatively "young" earth, and scientific evidences of created "kinds" of life-forms on earth (as opposed to interpreting empirical data as suggesting that mankind "evolved" from an ape-like ancestor), etc.

5.      Defendant Texas Higher Education Coordinating Board ("THECB") is a state agency; it is not sued as a defendant in this lawsuit (in contrast to the Austin litigation, where it is).

6.      The defendants are individuals who have acted under color of state law, via their official capacities at the THECB, and have thus committed acts violative of ICRGS's civil rights, by acting in concert to accomplish viewpoint discrimination in ways that violate the institutional academic freedom (e.g., academic speech) and religious liberty rights of ICRGS, its faculty, its students, and its potential students.  Those defendants, who are all sued only in their official capacities, are:  Raymund Paredes ("Paredes"), Lyn Bracewell Philips ("Philips"), Joe B. Hinton ("Hinton"), Elaine Mendoza ("Mendoza"), Laurie Bricker ("Bricker"), A. W. ("Whit") Riter III, Brenda Pejovich ("Pejovich"), and Robert Shephard ("Shephard").  Paredes is the THECB's Commissioner.  These defendants actively participated in THECB  proceedings during April of

2008, in ways that committed as-yet-unmitigated viewpoint discrimination (against ICRGS, causing ongoing civil liberty injuries) under color of state law.

7.      Regarding venue, all of the individual defendants are Texas-resident officials.    Also relevant to venue, some of the ongoing censorship (and other forms of viewpoint discrimination) about which this lawsuit focuses have occurred (and continue to occur) in Dallas, Texas.

8.      All of the defendants were served with process herein and have appeared (via the filing of a motion, now opposed and pending, under Rule 12 of the Federal Rules of Civil Procedure).

### III.  PRELIMINARY MATTERS  (THECB & SOAH PROCEEDINGS)

9.      This controversy arises from ICRGS's request for a government license, specifically, for a license ("Certificate of Authority") to offer and operate its 1981-established graduate school California-based program (which now consists of a ***Master of Science*** degree, with a major in Science Education, and with minor options that focus on Biology, Geology, Astro/geophysics, or General Science) in and from Texas.    That request was denied by defendants on April 24th of 2008, in conjunction with 2 meetings buttressed by documents that showed defendants' public disapproval of ICRGS's institutional viewpoint on the falsity of Darwin's evolution theory and the universe's age, as well as defendants' disapproval of ICRGS's institutional viewpoint on a variety of interrelated religious and scientific topics.    The THECB's administrative process included Dallas campus site visits, plus documentation of the ***M.S.*** program (and its justification), followed by events at THECB's building on April 23rd and 24th of 2008.

10.     In particular, the THECB decision that is now being complained of was formally voted on and announced publicly (by the defendants) on **Thursday, April 24th of 2008.**  The decision was itself an endorsement of the Commissioner's recommendation formally read into the record *on the previous day*, during a joint meeting (headed by defendant Phillips) of the THECB's

Academic Excellence & Research Committee and the THECB's Participation & Success Committee. The Commissioner's recommendation, in turn, predominantly relied upon advice from two *ex parte* advisory "panel" committees (of "scientists and science educators"), the composition of both failing the "balanced representation" requirement of a state agency advisory committee (as mandated by Texas Government Code § 2110.002).

11.    In ICRGS's application, as amended (by its Progress Report of March 2008), for a license (under what is now THECB Rule § 7.6) to grant a Master of Science degree in Science Education, ICRGS demonstrated, by documentation (and otherwise), that ICRGS met or exceeded the applicable THECB (now Rule § 7.8) "Standards of Certificates of Authority".

12.    Within an administrative law context Plaintiff has protested various violations of federal Due Process and Equal Protection, *inter alia*, pursuant to Title 19, Texas Administrative Code, Part 1, Chapter 1, Subchapter B, **Rule § 1.23**, as such is became procedurally applicable via Title 19, Texas Administrative Code, Part 1, Chapter 7, Subchapter A, **Rule § 7.6(d)(7)** ("Administrative Procedures related to Certification of Nonexempt Institutions").

13.    This administrative process was protested by ICRGS's SOAH petition, once posted as http://www.thecb.state.tx.us/AAR/PrivateInstitutions/ICRPetition_contestedcasestatus.pdf (q.v.) on the THECB's website ("SOAH petition"), a document of 755 pages including its appendices, which document's contents are incorporated herein by reference (to this amended complaint).

14.    As described below, ICRGS has attempted to use the administrative remedies process (including mediation conducted by a SOAH ALJ) to solve the civil rights problems of this case, but a critical Statute of Limitations forced ICRGS to commence an action prior to the complete exhaustion of that administrative appeal process. Also, some of the relief that ICRGS needs (and its entitled to) cannot be provided by SOAH, so waiting for any SOAH-based relief beyond the

Statute of Limitations deadline (for filing this lawsuit) would be statutorily futile. Since 42 U.S.C. § 1983 "adopts" the limitations deadline of "comparable" state law, the deadline for requesting injunctive and declaratory relief (neither of which is available via SOAH's administrative remedies process), in this case, is the one-year deadline of Tex. Civ. Prac. & Rems. Code § 110.007 (i.e., 42 U.S.C. § 1983 "adopts" the one-year deadline for this case).

15.    In sum, to the extent not legally "futile", ICRGS has tried to exhaust its administrative remedies in this controversy, to the extent that they jurisdictionally exist. This Court may want to abate this action (as SOAH goes forward), to allow the SOAH remedies process to (potentially) narrow the triable fact issues relevant to the need for injunctive relief herein.

16.    Meanwhile, ICRGS's 1st and 14th Amendments-based liberties are infringed, because issuing an *M.S.* degree is an academic assessment in the form of an "ultimate opinion" (about who is has learned "Science Education" as ICRGS teaches it, and has thus earned the recognition of ICRGS's *M.S.* degree). If ICRGS expresses that "ultimate [academic] opinion" about Texas residents, ICRGS does so at its peril. This is because the expression of ICRGS's "ultimate [academic] opinion", about who has earned the right to be recognized as completing ICRGS's M.S. program, in Texas, is now a *criminalized* form of "ultimate [academic] opinion" expression. In effect, THECB (via the concerted actions of all of the defendants, under color of state law) has denied ICRGS a license to offer its *M.S.* program to Texas residents, ICRGS is now impaired from freely advertizing its *M.S.* program to Texans, because ICRGS faces the threat of penal sanctions, if ICRGS were to academically act contrary to THECB's disapproval.

17.    Accordingly, since April 24th of 2008, ICRGS is faced with a legal dilemma, with both choices requiring ICRGS to experience unjustly discriminatory consequences:

(a) ICRGS could **actively stand** on its 1st (and 14th) Amendment rights and continue to offer its academic programs unto Texas residents, and then be (unjustly) prosecuted for offering what the THECB and defendants (acting under color of state law) unjustly characterize as a "fraudulent or substandard" degree program, via legal process that potential implicates Texas Deceptive Trade Practices – Consumer Protection Act jeopardies (including prosecution-of-crime jeopardies); or

(b) *alternatively,* ICRGS could **passively surrender** its 1st (and 14th) Amendment rights and permanently discontinue offer its academic programs to Texas residents, in order to avoid being (unjustly) prosecuted for offering what the THECB and the other defendants (acting under color of state law) would characterize as a "fraudulent or substandard" degree program, via legal proceedings that potentially implicate Texas Deceptive Trade Practices – Consumer Protection Act jeopardies.

However, ICRGS should not be forced to risk administrative fines, liability, or criminal prosecution in order to seek to preserve its legal rights, so this suit is a proper usage of declaratory judgment laws (federal or state) to avoid such a harsh dilemma. *See* MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-129 (2007).

18.    In light of the Commissioner's (and thus THECB's) prior willingness,[1] as recently as August 2007, to persecute Tyndale Theological Seminary, Southern Bible Institute, and Hispanic Bible Institute (all of which are Bible-based Protestant evangelical educational institutions), ICRGS reasonably concluded that the Commissioner (with the backing of the other defendants, under color of state law) is also likely to use color of state law to prosecute ICRGS, if ICRGS

---

[1] See HEB Ministries, Inc. v. THECB & Comm'r Pardes, 235 S.W.3d 627, 226 Educ. Law Reptr. 348 (2007), substantively reversing 114 S.W.3d 117 (Tex. App. – Austin 2003).

offers its *M.S.* degree program to Texas residents.    Subsequent actions of the THECB have

reinforced the reasonableness of this conclusion.    Moreover, ICRGS has been forced to fight for

its civil rights before, against viewpoint discrimination, as is illustrated by <u>ICR Graduate School</u>

<u>v. Honig</u>, 758 F. Supp. 1350, 1356, 66 Educ. Law Reptr. (S.D. Cal. 1991).

19.    Accordingly, due to the adverse actions of the THECB during April 2008, and the threat

of worse actions (apart from successful litigation herein), ICRGS ceased admitting Texas

residents into its *M.S.* program.    Likewise, ICRGS has (since April 2008) ceased advertizing

(from Texas) that it is willing to admit Texas residents into its 1981-established *M.S.* program.

### IV.   HOW VIEWPOINT DISCRIMINATION APPLIES TO THIS CASE

20.    ICRGS's Bible-informed viewpoint is not an exotic or recently invented tenet which

ICRGS affirms.[2] ICRGS simply agrees with, and thus adopts, the Bible-transmitted view of the

apostle Paul, who wrote that the natural creation so effectively displays proof of God's

creatorship that anyone who rejects that natural evidence is "without excuse".[3]

---

[2] Compare the U.S. Supreme Court's respect for the Seventh Day Adventists' "free exercise" of
their Creation Week-based Sabbath, a traditional and long-established religious teaching.  *E.g.,*
<u>Sherbert v. Verner</u>, 374 U.S. 398 (1963).  *See also, accord,* <u>Tooley v. Martin-Marietta Corp.,</u> 648
F.2d 1239 (9th Cir. 1981); <u>Padon v. White</u>, 465 F. Supp. 602 (S.D. Tex. – Houston 1979).

[3] See Romans 1:18—21, especially 1:20 ("For the invisible things of Him from the creation of
the world are clearly seen, being understood by the things that are made, even His eternal power
and Godhead; so that they are without excuse").    <u>ICRGS's founder, Dr. Henry M. Morris,</u>
<u>provides this footnote commentary to **Romans 1:20**, in his annotated *Defender's Study Bible*</u>:
"The phrase 'without excuse' is, literally, 'without an apologetic' or 'without a defense.'  I Peter
3:15 instructs Christians to 'be ready always to give an answer,' where the word 'answer' is
practically the same in both cases (Greek *apologia*).    In other words, Christians do have an
apologetic  and ought to be ready to give it  whenever someone attacks or questions their faith.
Those who do not see the eternal power and nature of God in the creation, on the other hand,
have no apologetic.    They are 'without excuse' (*anapologetos*) if they do not believe in our
Creator God.    The evidence is all around them."   (*Quoting from* page 1231, 1995 edition.)

---

21.    The defendants, acting in their official capacities (and under color of state law and office), have publicly disagreed with ICRGS's viewpoint, by endorsing the Commissioner's opinion that the earth's origin is traceable to a cosmic "Big Bang" some "14 billion years" ago. ***But the Commissioner's "Big Bang" opinion is not a matter of education <u>law</u> in Texas, to be authoritatively and coercively imposed on any <u>private</u> institution that seeks to teach graduate-level "science education".*** Similarly, defendants (under color of state law, acting through THECB) do not have the legal right  --  constitutionally speaking  --  to brand, as if with a "scarlet letter", ICRGS's creation science viewpoint as "fraudulent", when doing so requires the THECB (as a state agency regulating government spending on higher education) to publicly and officially endorse the Commissioner's personal beliefs about evolutionary processes and his personal belief in a "Big Bang" cosmogony.    The Texas Supreme Court ruled that no state governmental claim of "fraud" can be made, if that value-judgment depends upon evaluating the ***truth*** or legitimacy of a particular religious opinion.[4]    *See also, accord*, <u>Barr v. City of Sinton</u>, 2009 WL 1712798 (Tex. 2009) (construing, in a case of first impression, the Texas Religious Freedom Restoration Act of 1999, codified at Tex. Civ. Prac. & Rems. Code § 110.001 *et seq.*

22.    The historic fact that the triune God of the Bible, acting through Christ, created the cosmos slightly more than 6,000 years ago, is a religious belief.    That religious belief is a sincerely-held institutional viewpoint of ICRGS, qualifying how ICRGS teaches science and

---

[4] <u>Tilton v. Marshall</u>, 925 S.W.3d 672, 678—679 (Tex. 1996) (**no legal claim of "fraud" can be made, by the State of Texas government, if that claim depends upon the government evaluating the truth or legitimacy of a particular *religious opinion*).**  As such, defendants, when acting in their official capacities as officers of the State of Texas (via offices at its THECB), according to the Texas Supreme Court, should ***not*** be pronouncing an <u>epistemological judgment</u> on whether ICRGS's institutional viewpoint (regarding the universe's origins, regarding mankind's origin, etc.) is "true" or "false", "legitimate" or "fraudulent".

science education. That religious belief about Christ (which is ICRGS's *private sector* institutional viewpoint that defendants have publicly disapproved under color of state law) is a core component of ICRGS's conspicuously affirmed Biblical creationism viewpoint "tenets".

23.    THECB documents appear to show that ICRGS's institutional viewpoint is, for the most part, why ICRGS's application was disapproved, rejected, and denied by defendants. On papers used by the Commissioner's improperly composed advisory "review panel" committee, "smoking gun" markings repeatedly show that such viewpoint distinctives were adverse reaction-triggering problems for that advisory "panel" committee. Examples of such "smoking gun" indicators of anti-creationist and viewpoint-discriminatory prejudices include quoting "objectionable" aspects of ICRGS's viewpoint, as well as providing editorial remarks against creationist perspectives applied to science education: "from the Christian worldview" (Skoog), "with Biblical theories" (Skoog), "defend a creationist worldview" (Skoog); "biblical creation" (Skoog); "Compare and contrast evolution and creation using the major stages of embryology and the accompanying histology" (Skoog); "Evaluate flaws in the theory of biological evolution" (Skoog, obviously disapproving the academic viewpoint that *Darwin was wrong*); "A research paper with 'a minimum of 5 pages on a topic relating anatomy to the evolution/creation debate'" (Skoog); "framework of Biblical creationism" (Skoog); "Evaluate creationist vs. evolutionist explanations for the 'Cambrian explosion,' mass extinction, 'mammalian adaptive radiation,' convergence, 'living fossils,' and stasis" (Skoog); "Relate the 'Ice Age:' to post-flood catastrophism and to Florida fossils" (Skoog); "'numerous paleontological contradictions to the evolutionary model . . . fossil evidence . . . the nearly simultaneous creation of separate complex kinds, subject to struggle and death . . . fossilized rapidly and recently worldwide in Noah's flood, preserved to repopulate the earth with new life" (Skoog rejects these Paleontology

topics as "conclusions" which "have no legitimate place in paleontology and other science courses", noting that the Paleontology course has [the nerve to use] two creationist resources, the book *Creation: Facts of Life* [authored by Dr. Gary Parker, who formerly taught evolution] and the DVD *From Evolution to Creation*); "Compare and contrast the old-earth and young-earth models of earth history" (Skoog, apparently bothered that ICRGS likes to "teach the controversy"); "Analyze radioisotope dating methods to discover their critical problems and assumptions in order to argue coherently for a young-earth model" (Skoog); "Three of the five required textbooks for the course are creationist publications that emphasize that the earth is quite young" (Skoog); "to prepare science teachers and other individuals to understand the universe within the integrating framework of a biblical perspective using proven scientific data" (Skoog); "Two of the three required textbooks for this course are published by Master Books and reflect the creationist tenet that the earth is young. Neither of these textbooks or the five aforementioned objectives would be a part of a graduate cosmology course in any public university in Texas or the nation" (Skoog, effectively ignoring ICRGS's academic and religious freedoms as a *private* college with a creationist viewpoint); etc.

24.     The above-quoted phrases of defendants' primary *ex parte* advisor, Gerald Skoog, pose like a '*poster child*' of viewpoint discrimination, mismatched to the non-theistic secularism federal courts now mandate for **public** schools. Similar religious-viewpoint-hostile reactions were publicly echoed in Ass't Comm'r Joe Stafford's remarks on April 23rd, 2008 (as he read Biblical creationist tenets from ICRGS's catalog), and were publicly endorsed and re-echoed by Commissioner Raymund Paredes that day. The next day (April 24th, 2008), at the THECB board meeting, the same viewpoint discrimination was unmitigated, with a "rubber-stamp" ratification of that viewpoint discrimination voiced by the voting THECB board members (while

ICRGS's representatives were explicitly muzzled, an act of comparatively unequal treatment). This viewpoint discrimination, and unjustified mischaracterization of ICRGS's curriculum, is summarized (and explained with factual details) within the attached **"Affidavit of Dr. Patricia Nason",** which affidavit is incorporated herein as part of this amended complaint.

25.    In short, defendants have no valid constitutional role, when acting as THECB officials (under color of state law), to restrict ICRGS's academic freedom as a private non-government-funded higher education-providing institution.    Neither is it the constitutional role of THECB officials, like defendants, to use their official powers to *ban* ICRGS's graduate degrees as "fraudulent or substandard" just because ICRGS rejects the Commissioner's opinion about whether earth originated from an un-witnessed evolutionary "Big Bang" (about 14,000,000,000 years ago), rather than originated in an orderly and intelligently designed manner (a bit more than 6,000 years ago).  Notwithstanding Commissioner Paredes personal view of the universe's origins, ICRGS has a legal right to provide a science education-focused M.S. degree program (as a matter of academic viewpoint freedom), because ICRGS holds the institutional academic viewpoint (on both Biblical and scientific grounds) that clashes with Commissioner Paredes' personal opinion that the earth was derived from primeval events which occurred, without human eye-witnesses, some "14 billion years" ago.    When Earth began, Commissioner Paredes was not there, so he was not an eye-witness to Earth's origin.[5]  Consequently, Commissioner Paredes' opinion about the age of the earth is not based on *empirical* observations; rather, that opinion is a blend of assumptions, mixed with some *forensic* analysis inferences, interpreted in accordance

---

[5]  Public records indicate that defendant Paredes was not born until 1942.  Ironically, even among non-creationist scientists (e.g., "steady-state" theorists), the "Big Bang" is not above reproach; nor is the uniformitarian geology ideal, the so-called "geologic column", deemed sacrosanct by all evolutionists.

with Commissioner Paredes' own epistemological presuppositions,   --   and buttressed by the Commissioner's reliance on the "expert" advice of his *ex parte* ad hoc advisory committee.

26.     Furthermore, merely "passing the buck" from the Commissioner to a few evolutionist scientists (on Paredes' *ex parte* ad hoc advisory committee) likewise fails to convert the age-of-the-earth controversy into an eye-witness prove-up. Although evolutionist scientists (or creationist scientists, for that matter) can discuss the origin of life on Earth, and of Earth itself, such observation-lacking discussions do *not* become "*empirical* science" simply because those discussions emit from the mouths or pens of "scientists" who often use empirical science methodologies when observationally investigating *present-day* phenomena. The main problem, here, is **viewpoint discrimination:** using the power of government, including government gate-keeping of the academic market's "forum", to disfavor creation science as an academic viewpoint, in violation of the "open forum" principles explained (and enforced) by the U.S. Supreme Court, e.g., in Rosenberger v. Rector & Visitors of the University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 101 Educ. Law Reptr. 552 (1995). Although educational liberty (a/k/a "academic freedom") does not include or justify a "sham"[6] (such as a "diploma mill"), it does include the basic idea that a formal education is mostly a defined and documented program of teaching, and an integral part of any such formal teaching (especially a higher education program of study) is the teacher's assessment of the individual learner's mastery of the program-defined teachings.     In other words, the process of "teaching" is not complete without meaningful "assessment" of the learner's learning.     Unsurprisingly, the college faculty's *ultimate* educational role in educational **"assessment"** is the college faculty's decision to award an academic degree, to denote a very specific and satisfactory completion of an educational

---

[6] Texas Educ. Agency v. Leeper, 893 S.W.2d 432, 443—444 (Tex. 1994, reh'g denied 1995).

program of study.  Ultimately, therefore, the awarding of an earned academic degree is a blending of **objective** educational achievement criteria (i.e., the listed or otherwise pre-defined objectives of a college degree program's curriculum) with the **subjective** opinions of the relevant college faculty,  --  about whether John Doe or Jane Roe has satisfied those specific educational criteria, sufficiently, to merit being recognized as having earned a "Master of Science in Science Education" (or some other degree).  ICRGS is now cheated from that liberty.

27.    Institutional academic freedom, the hallmark of Anglo-American university traditions, relies upon a college's chosen curriculum (for a specific degree program).  In ICRGS's case, the science education curriculum—grounded legal question was (and is):

whether, as a matter of **academic freedom** (including the "add-on" **institutional viewpoint** component within a science education program), ICRGS may institutionally opine (as a matter of institutional academic speech),  --  in the form of a *M.S.* in Science Education,  --  that a given graduate student is *worthy* to be recognized as having earned a "Master of Science" in "Science Education", ---  in academic situations where and when ICRGS's faculty are, based on pre-written and extensive[7] educational criteria, satisfied that the graduate student has adequately learned "science education", as a result of having successfully completed a sufficient number of courses selected (in conjunction with an elective Minor) from this course list:

AG   501            Planetary & Stellar Astronomy

AG   501L           Planetary & Stellar Astronomy **LAB**

AG   502            Geochronology with **LAB**

AG   503            Paleoclimatology with **LAB**

---

[7] "Extensive" here means 1 or 2 academic "years" worth of master's-level science education.

| AG | 504 | Creation Cosmology & the Big Bang Theory |
|----|-----|---|
| BI | 501 | Biological Origins |
| BI | 501L | Biological Origins **LAB** |
| BI | 502 | Comparative Vertebrate Anatomy |
| BI | 502L | Comparative Vertebrate Anatomy **LAB** |
| BI | 503 | Principles & Patterns in Paleontology |
| BI | 504 | Advanced Ecology with **LAB** |
| BI | 505 | Advanced Cell & Molecular Biology |
| GE | 501 | Physics & Geology of Natural Disasters |
| GE | 502 | Geochronology with **LAB**  (same as AG 502) |
| GE | 503 | Principles & Patterns in Paleontology |
| GE | 503F | Principles & Patterns in Paleontology **FIELD STUDY** |
| GE | 504 | Interpreting Earth History |
| GE | 505 | Field Geology |
| SC | 501 | The History & Nature of Science |
| SE | 501 | Advanced Educational Psychology |
| SE | 502 | The Science Curriculum |
| SE | 503 | Planning Science Instruction:  Methods |
| SE | 504 | Research in Science Education |
| SE | 505 | Implementing & Assessing Science Teaching |

(The specific curriculum for those above-listed courses was timely provided to THECB during March 2008.  Yet the defendants (acting as officials of THECB) have effectively treated this curriculum as a non-"science"/non-"science education" curriculum.

28.    <u>Faculty academic freedom</u>, which allows for flexibility in instructional details and teaching styles, within "due process" guidelines, largely navigates those charted-out criteria, guided by determinations relying on the somewhat ***subjective*** opinions of the relevant college faculty: conclusions about whether an individual learner has or has not achieved the pre-defined educational objectives of a degree program.  Thus, it is not (nor has it ever been) the proper role of the government to substitute its own preferential academic ***opinions*** for the academic freedoms traditionally exercised at the private institutional and private faculty levels.[8]

## V.  APPLICABILITY OF TEXAS EDUCATION CODE  § 1.001(a)

29.    Of course, a state government, exercising its conditional "consumer" rights under a constitutional or statutory *Spending Clause* provision, may condition or otherwise influence private institutions' academic freedoms, as any educational consumer may, by choosing to buy (i.e., approve for government grants and/or loan-based funding) one type of academic program over another.  (*Example:* "Faith-based Initiative" spending.[9])  However, ***any such government-funding influence*** (which economic realities may suggest is "coercive") ***has no legal relevance in an educational context where government funding is neither sought nor accepted.***  In such a context, where a private college neither seeks nor accepts government funding, the state government has no constitutional "business" interfering with the "academic speech" of that private institution,  --  unless there really is a harmful "sham" on the educational market, based upon clear and convincing ***objective*** criteria.  *See especially* Texas Education Code **§ 1.001(a),**

---

[8] *See, accord*, <u>Asociación de Educación Privada de Puerto Rico, Inc. v. Garcia-Padilla</u>, 490 F.3d 1, 222 Educ. Law Reptr. 32 (1st Cir. 2007).  *See also* <u>Peel  v.  Attorney Registration & Disciplinary Commission of Illinois</u>, 496 U.S. 91, 103-104, 110 S.Ct. 2281, 2289 (1990).

[9]  <u>Hein v. Freedom from Religion Foundation</u>, 127 S.Ct. 2553 (2007) ("faith-based initiative" was justified, within the Executive branch of government operations, under the 1st Amendment).

---

in light of the judicial duty to constitutionally "save-the-statute", as explained within <u>NLRB v. Catholic Bishop of Chicago</u>, 440 U.S. 490, 99 S.Ct. 1313 (1979) (Court has *duty to interpretively save* a statute from unconstitutional outcomes, so interpreting a delegation statute to avoid interfering with or "entangling" religious liberty is preferable to construing that statute otherwise). This Court should act the "save the stature" from violating free academic speech.

## VI.  COMPARABLE ACADEMIC SCENARIOS, TO CLARIFY THE PROBLEM

30.     As a matter of academic freedom, ICRGS would show that a *private* higher education institution has a legal right to endorse and express itself by ***institutional viewpoint*** distinctives, whether such institutional viewpoints be religious, political, or scientific viewpoints.[10]

### 30-A.  **Example # 1:   Science Education Degrees at a Roman Catholic college.**

For example, a Roman Catholic college may religiously define and distinguish itself as such. It might offer "science education" degrees regardless of its theological tenets about sacramental trans-substantiation, even if non-Catholic science educators say they cannot reconcile that "sacrament" with empirical "science".     Could a THECB dominated by Protestants, who personally reject trans-substantiation doctrine as "false religion", constitutionally reject the Catholic college's legal right to offer such a "Science Education" degree program?    What if THECB did so on the recommendation of a non-Catholic Commissioner, who relied upon the "science expertise" of a "panel" of Protestant science educators (all of whom disbelieved the Catholic doctrine of trans-substantiation)? Would a substantially burdensome action of the THECB, in such a scenario, be a violation of the Texas

---

[10] *E.g., see* <u>Asociación de Educación Privada de Puerto Rico, Inc. v. Garcia-Padilla</u>, 490 F.3d 1, 222 Educ. Law Reptr. 32 (1st Cir. 2007).

Religious Freedom Restoration Act of 1999?   (What if the Catholic college required all of its science education faculty to respect its institutional "Eucharist viewpoint"?)

30-B.   **Example # 2:   World History Degrees at a Jewish college.**

Likewise, a Jewish college may accurately define and distinguish itself as a Jewish college, offering a world history program,  --  without being required to sacrifice its institutional viewpoint that world history should *not* be dichotomized by the arrival of Jesus Christ, historically, the B.C./A.D. division of human history.   This institutional viewpoint, arguably, clashes with the 2nd Sentence of U.S. Constitution Article VII,  --  but any such institutional viewpoint is nonetheless protected by that same Constitution's First Amendment, as a "hybrid" matter of academic speech and free exercise of religion.   Could a THECB dominated by Christians, who personally affirm that Jesus dichotomized human history, by coming to Earth as the Jews' promised Messiah, constitutionally reject the Jewish college's legal right to offer such a "World History" degree program?   Would a substantially burdensome action of the THECB, in such a scenario, be a violation of the Texas Religious Freedom Restoration Act of 1999?   (What if the Jewish college required each of its world history faculty to respect its institutional viewpoint that "Jesus was *not* the Jews' promised Messiah"?)

30-C.   **Example # 3:   American History Degrees at an African-American college.**

Similarly, a government-funded college may emphasize its distinguished African-American tradition, as a matter of historical and/or ethnic heritage.   But can it offer a degree program in "American history", and weight the emphasis of such history studies with "Black History" (i.e., the cultural contributions of notable African-Americans, such as the *creationist* scientist George Washington Carver)?   Or would doing so put the college at risk of being governmentally threatened with loss of its degree-granting powers, by the THECB, under the

colorable charge that its emphasis was a *de facto* "racist" minimization of the "white" contributions to "American Civilization"?    Could a THECB dominated by non-black Americans, who personally prefer to avoid ethnocentric emphases in social studies (such as "Black History" studies), constitutionally reject the African-American college's legal right to offer a "American History" degree program,  --  if the African-American college required all of its world history faculty to respect its institutional viewpoint that "Black History" would dominate its curriculum?    What if the college promoted its right to emphasize "Black History" as inextricably intertwined with *religious* appreciation for their ethnocentric identity, *as a matter of creaturely gratitude for being created* with their specific ethnic heritage?

30-D.    **Example # 4:    Business Degrees at a Protestant Evangelical college.**

Likewise, LeTourneau University, a Protestant Christian liberal arts university, is historically known for its engineering school, its missionary aviation program, and its night-college business program for working adults.    Could a THECB dominated by Bible-rejecting non-Christians, who personally prefer to avoid entangling Biblical principles with business practices, constitutionally disqualify LeTourneau University's business degree program (for working adults),    --    due to a LeTourneau instructor repeatedly identifying *Amos 3:3* as a partnership principle,  --    or *Exodus 21:28-29* as a foreseeable tort injury principle, -- or *Deuteronomy 22:6-7* as a wildlife protection/sustainability principle, -- or *Deuteronomy 20:19-20* as a deforestation prevention/environmental protection principle?    What if LeTourneau University requires its business faculty to sign an agreement to respect the official doctrinal statement of the university, and to role-model Biblical Christian principles *and teachings* in the classroom, while teaching business courses to business degree students?    Can the THECB deny

LeTourneau's degree-granting authority if LeTourneau's Protestant institutional viewpoint distinctives are repulsive to a voting majority of the THECB board (or to the Commissioner)?

30-E.    **Example # 5:  Science/Education Degrees at a Seventh Day Adventist College**

Constitutional law—mandated "accommodation" of Seventh Day Adventist viewpoints is nothing new to American jurisprudence.[11]    Accordingly, it is to be expected that Seventh Day Adventist viewpoints are "accommodated" in Seventh Day Adventist education, including Seventh Day Adventist higher education programs.  One example of such higher education, in Texas, is <u>Southwestern Adventist University</u>, which provides a variety of undergraduate and graduate programs.  Of special relevance to ICRGS's case is the fact that the institutional viewpoint of Southwestern Adventist University, as a faith-integrated institution of higher education, includes a foundational tent of Bible-informed creationism:

**6.    Creation:**  God is the Creator of all things, and has revealed in Scripture the authentic account of His creative activity.  In six days the Lord made "the heaven and the earth" and all living things upon the earth, and rested on the seventh day of that first week.  Thus He established the Sabbath as a perpetual memorial of His completed creative work.  The first man and woman were made in the image of God as the crowning work of Creation, given dominion over the world, and charged with responsibility to care

---

[11] *See, e.g.,* <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963) (state-government-imposed condition of receiving state benefits interfered directly with, and effectively punished, the free exercise of a traditional and long-established teaching of the Seventh Day Adventist church, producing an unconstitutional result). *See also, e.g.,* <u>Tooley v. Martin-Marietta Corporation</u>, 648 F.2d 1239 (9th Cir. 1981) (accommodation requested by Seventh Day Adventist was "reasonable"; also, providing a reasonable accommodation for a sincerely held religious conviction does not violate the First Amendment's Establishment Clause, because such accommodations are just that, "accommodations", and were not governmental endorsements of the accommodated religious tents or practices); <u>Padon v. White</u>, 465 F.Supp. 602 (S.D. Tex. – Houston 1979) (employer failed to offer reasonable accommodation to Seventh Day Adventist employee).

---

for it.  When the world was finished it was "very good," declaring the glory of God. (Gen. 1; 2; Ex. 20:8-1; Ps. 19:1-6; 33:6, 9; 104; Heb. 11:3).[12]  It should be noticed that Southwestern Adventist University conspicuously posits its religious viewpoint, regarding creation, as an institutional viewpoint distinctive of its higher education mission --  so there can be no "deception" to prospective students or prospective employers who use due diligence to learn about "science" and "science education" as taught by Southwestern Adventist University.    In a society which prides itself, historically at least, on civil liberties, there is no reason why the THECB, or any other arm of Texas state government, should penalize Southwestern Adventist University, or any other Seventh Day Adventist college, for "integrating" its faith distinctives with its teaching of "science" and/or "science education".    **Likewise,** neither should ICRGS be deprived of any government-issued license (such as any required license to offer graduate programs in Science Education unto Texas residents), solely because ICRGS chooses to retain and exercise some of its civil rights as an American institution espousing young-earth-creationist-informed Biblical Christianity.[13]

## VII.   DEFENDANTS INFRINGE ICRGS'S FREEDOM OF ASSOCIATION

31.    Likewise, a private college may, under our present U.S. and Texas Constitutions, choose to emphasize **Native American** or **Hispanic-American** or **Asian-Pacific** or **Arab-Muslim**

---

[12] See http://www.swau.edu/spirituality/beliefs.asp (last viewed 5-12-AD2008).

[13] *Accord, see* Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790 (1963) (coercive conditions for receiving state government-mediated benefits were unconstitutionally interfering with the free exercise of a traditional and long-established religious teaching of the Seventh Day Adventist church).   Perhaps 21st century Americans are desensitized to the phrase "free exercise of religion"; the Bill of Rights does not stand to protect the legal right to merely "exercise" one's religion; rather, it is the legal right to "freely" exercise one's religious views and practices, that the First Amendment was ratified to safeguard.

heritage features, as a matter of institutional academic freedom. (Other examples could be given, but those already given should suffice.) Safeguarding institutional academic freedom provides an academic opportunity for exercising "freedom of association" rights (which are inextricably intertwined with "free speech" and "free press" rights).[14]

32.   In other words, the defendants' actions, under color of state law, have wrongfully interfered with ICRGS's institutional academic freedoms in a manner that encroaches on ICRGS's **"freedom of association"** rights. In ICRGS's case, the monopolistic realities of the science education market, in Texas (and in America generally) would limit creationist learners to science education opportunities from evolutionist graduate schools, because ICRGS is the only graduate school which specializes in creationism-informed science education. Therefore, "freedom of association" (and academic speech), at the graduate school level, is effectively curtailed if ICRGS is banished from the graduate science education market. *See, accord,* Fowler v. Rhode Island, 345 U.S. 67, 69-70, 73 S.Ct. 526, 527 (1953). However, during the THECB proceedings (in April 2008 especially), defendants made much of the fact that ICRGS has, as part of its core-values-based mission, conspicuously expressed "tenets" of Biblical (and scientific) creationism, which are "integrated" (or "embedded") into its curriculum and instruction of science education, -- as if that was a bad thing. By doing so, defendants used their state offices to injure ICRGS's

---

[14] *See* NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163 (1958), *with* Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526 (1953), *cited in* John Eidsmoe, The Christian Legal Advisor, rev. ed. (Grand Rapids: Mott Media/Baker Book House, 1987), page 170.    *See also, accord, Texas cases citing* NAACP v. Alabama, e.g., In re CFWC Religious Ministries, Inc., 143 S.W.3d 891, 892 (Tex. App. – Beaumont 2004, no writ); Tilton v. Moyé, 869 S.W.2d 955, 956 (Tex. 1994). Regarding impermissible state-sponsored viewpoint discrimination in an academic context, see Tinker v. Des Moines I.C.S.D., 393 U.S. 503, 509, 89 S.Ct. 733, 738 (1969) ("In order for the State … to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

**"freedom of association"** rights, to the extent that those freedom-of-association rights depend on (or hinge) to ICRGS's institutional academic freedom rights to offer a creationist-viewpoint-affirming graduate degree program in "science education". Moreover, this regulatory "chilling" of ICRGS's academic speech should also be judicially declared unconstitutionally "vague for voidness" and/or unconstitutionally "overbroad".

## VIII.  DEFENDANTS FAIL "ACCOMMODATION" OBLIGATIONS

33.    Obligatory "accommodation", to religious viewpoint liberties, is also mandated by Texas statutory law, specifically, the *Texas Religious Freedom Restoration Act of 1999* ("Teas RFRA of 1999"), codified at Texas Civil Practice & Remedies Code, Chapter 110,  --  recently construed by the Texas Supreme Court in <u>Barr v. City of Sinton</u>, 2009  WL  1712798 (Tex. 2009). Thus, defendants' *ultra vires* actions, under color of state law,  were committed without legal justification from either a federal law perspective or a state law perspective.   The Texas RFRA of 1999 requires Texas government agencies, and thus also their agents (including the defendants), to avoid substantially burdening free exercise of religion, unless and only when the following conditions are satisfied:  the government-imposed burden on religious liberty "is in furtherance of a compelling governmental interest"; and the government-imposed burden on religious liberty "is the least restrictive means of furthering that interest".  (*Quoting from* Tex. Civ. Prac. & Rems. Code **§ 110.003** ("Religious Freedom Protected")).   Yet defendants (under color of state law), by their actions during 2008, and by their ongoing failure to act remedially thereafter, have violated and are continuing to violate this aspect of the Texas RFRA of 1999.

34.    Also, notwithstanding the authoritative precedent for preferring statute interpretations that avoid unconstitutional results,[15] defendants have chosen to interpret and apply at least 3 Texas statutes in ways that unconstitutionally infringe ICRGS's religious viewpoint freedoms.

35.    It is untrue that THECB has a "compelling governmental interest" to defend Darwin's errors (or the idea that all material existence derives from an accidental "Big Bang" which occurred 14,000,000,000 years ago), so there is no excuse for the government-imposed burdens that defendants (acting under color of state law) have imposed upon ICRGS as a provider of graduate-level science education from a Biblical creationist viewpoint.

36.    It is also untrue that THECB (or the other defendants) had or have a compelling state interest to "protect" Darwin's evolutionary theory from being criticized, in ICRGS's *private* sector graduate school online programs, science lab exercises, and/or paleontology field studies, from criticism and falsification.   Accordingly, ICRGS should not be denied a degree-granting license primarily because its consistent approach to teaching science education has a creationist viewpoint, as is illustrated by ICR's scientific publications  (e.g., hydrologist Henry Morris' and geologist John Morris' respective analyses of the geology-relevant evidence for and impact of the Genesis Flood;[16]   geologist Steve Austin's analysis of the geologic importance of the 1980

---

[15] *See* Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511 (1892) (using legal history, including America's Christian heritage, to clarify how federal statutes should not be presumed to violate the 1st Amendment), *reversing* 36 F. 303 (S.D.N.Y. Cir. 1888) (imposing $1,000 fine on a church for violating a federal law banning immigrant labor).

[16] *See* Henry Morris,  www.icr.org/article/genesis-flood, and John Morris, www.icr.article/are-fossils-result-noahs-flood .  *See also, accord,* John Morris, www.icr.org/articles/print//570, and Henry Morris, www.icr.org/article/Jesus-flood .

Mount St. Helens eruption-caused mudflows and canyon formation via rapid sedimentation;[17] biologist Frank Sherwin's and geologist John Morris' respective analyses of the inferential importance of the fossil record's "missing links" (which are still "missing" in the real world, yet which continue to appear in evolutionist textbooks and imaginations);[18] biologist Frank Sherwin's analysis of how so-called "junk DNA" is now being understood as highly complex and intelligently designed "nothing-close-to-junk" DNA;[19] biologist Frank Sherwin's analysis of how the "stasis" of insects preserved in amber support a non-evolutionary explanation of biological history, as well as the purposeful complexity of so-called "simple bacteria;[20] physicist John Baumgardner's analysis of the limitations of the scientific method;[21] physicist Thomas Barnes' analysis of scientific evidences (including Lord Kelvin's analysis) disfavoring an "old" earth cosmogony;[22] microscopist Mark Armitage's and geologist Andrew Snelling's analysis of

---

[17] *See* Steven Austin,    www.icr.org/article/erosion-mount-st-helens   "Mount St. Helens: Explosive Evidence for Catastrophe" [ICR DVD], and www.icr.org/article/mt-st-helens-catastrophism, and www.icr.org/article/mount-st-helens-catastrophism (technical paper).

[18] *See* Frank Sherwin, www.icr.org/article/3229, *and* John Morris, www.icr.org/article/whats-missing-link . *See also, accord,* James J. S. Johnson, www.icr.org/article/3763, citing United States v. Akpan, 407 F.3d 360 (5th Cir. 2005), and United States v. Okoro, 213 Fed. Appx. 348, 2007 WL 98804 (5th Cir. 2007) (non-precedent).

[19] *See* Frank Sherwin, www.icr.org/article/3396 .

[20] *See* Frank Sherwin, www.icr.org/article/2824 and www.icr.org/article/771 (provided within Appendix "X" to ICRGS's SOAH Petition of March 24th, AD2008.

[21] *See* John Baumgardner, www.icr.org/article/3749 .

[22] *See* Thomas Barnes, www.icr.org/article/63 .

---

radiohalos inside diamonds as disfavoring an "old" earth cosmogony;[23] etc., etc., etc.[24]).

Also, via ICRGS's SOAH Petition's Appendix "N", the THECB was provided with data about

the historic contributions of many scientific pioneers whose valuable scientific contributions

were aided, not impaired, by their creationist viewpoints.  *See* the aforesaid SOAH Petition's

Appendix "N", providing relevant data on Lord Kelvin, Isaac Newton, Johannes Kepler,

Matthew Maury, John Ray, and Konrad Gessner, Robert Boyle, etc.;  *see also*  SOAH Petition's

Appendix "W", outlining findings of ICR's *Radioisotopes and the Age of the Earth* ["RATE"]

Project, including multi-disciplinary scientific research (e.g., scientific research on radioisotope

dating methods; isochron analysis rock dating; nuclear decay evidenced by fission tracks in

zircons; diffusivity of helium through zircons in granite and alternative radioisotopic clocks;

evidence of catastrophism in uranium, thorium, and polonium radiohalos; carbon 14 in coal and

diamonds analyzed using accelerator mass spectrometer methods;  etc.);  *see also* geologist

Steven Austin's "excess argon" critique of potassium-argon dating problems, illustrated at

Mount St. Helens, in ICRGS's SOAH Petition's Appendix "W";  *see also* electron microscopist

Mark Armitage's analysis of purposeful design in parasitic worms in the same Appendix "W".

37.    Despite the above-cited examples of creation science research and scholarship, which

obviously demonstrates serious "science" usable for "science education", the defendants treated

ICRGS as if it were merely a religious studies operation spiced by a bit of science here and there,

and defendants provided ICRGS with no meaningful 1st Amendment-oriented accommodation.

## IX.  MONOPOLY & INTERSTATE COMMERCE INTERFERENCES

[23] *See* Mark Armitage & Andrew Snelling, www.icr.org/article/radiohalos-diamonds, providing link to www.icr.org/i/pdf/research/ICC08_Radiohalos_Diamonds.pdf .

[24]  See http://www.thecb.state.tx.us/AAR/PrivateInstitutions/ICRPetition_contestedcasestatus.pdf (ICRGS's 755-page "Petition for Contested Case Status", submitted May 24, AD2008).

38.    The Texas Constitution,[25] directly, and the U.S. Constitution,[26] indirectly, both oppose the kind of monopoly power which the evolutionary establishment has in Texas (and elsewhere), over science education.   Freedom to believe and teach evolution is one thing; monopoly control over the entire public **and private** higher education "market" is another.  It is monopoly control, facilitated by defendants' action under color of state law, over the private sector's graduate-level science education market that causes ICRGS's ongoing academic speech injury.

39.    In this case legitimate academic speech is being monopolized.  Despite defendants' oppositions to the contrary, ICRGS is entitled  to academically use its **"free speech"** rights (to use a phrase from the First Amendment), and to academically express its **"opinions on any subject"** (to use a phrase from the Texas Constitution), to teach and to assess the learning of its Science Education students (as they pursue years of graduate-level course of study in science education.   Yet defendants have misused their state offices at the  THECB to rule as if THECB itself was the monopolistically *exclusive* issuer of science degrees (similar to how the English king or queen, historically, was the monopolistically exclusive issuer of knighthoods and other merit-or-favor-based **"titles of nobility"**).  By monopolizing "science" and "science education", under threat of criminalizing the issuance of legitimately earned academic degrees, the defendants have enabled the state government to function like an exclusive franchisor of "titles".

40.    By claiming the exclusive right (of THECB) to license the issuance of private sector academic degrees (not funded by state tax monies), defendants have chilled ICRGS's academic speech --- despite the time-honored American tradition that *private* colleges may issue such graduate degrees, because the academic opinion inherent in a degree conferral, if conferred in

---

[25] Texas Constitution, Article 1, § 26 ("perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed . . . . ").

[26]  U.S. Constttn., Article I, § 9 ("No Title of Nobility shall be granted by the United States…")

good faith (and not as a "sham"), is an academic *opinion* of that educational institution's faculty, because such graduate degrees are *not* academic opinions of the State of Texas.  *See* Peel, *supra*, 496 U.S. at 103-104; 110 S.Ct. at 2289 (noticing **"the consuming public understands that licenses ... to convey an educational degree ... are issued by private organizations"** and do not **"misleadingly"** imply state endorsement).   Likewise, in academic contexts where reasonable persons could differ, about a student's entitlement to a graduate science degree (as opposed to the very different situation where a "sham" or "diploma mill" program is involved), the First and Fourteenth Amendments do not allow  the State of Texas have *de facto* "gate-keeping" veto-power over *all* science degree conferrals in the State of Texas.  The reason why this is so is because, as Peel indicates, *private* colleges confer graduate degrees, because doing so involves  a private institution's academic *opinion* inherent in a degree conferral, assuming that the degree is conferred in good faith (and not as a "sham", as clarified in Peel, *supra*, 496 U.S. at 109; 110 S.Ct. at 2292).

41.    However, defendants (under color of state law) have gone further, as is shown by their involvement in issuing a "press release" that favoritistically promotes SACS's academic monopoly in Texas, as is described below.  This action by the defendants further injures ICRGS's academic freedoms, because it further confirms that defendants would condition ICRGS's academic speech exercise on ICRGS's willingness to seek accreditation from the **Southern Association of Colleges and Schools ("SACS"[27]),**  --  as opposed to Transnational

---

[27]  It THECB's official website the following appears as part of the "Media Advisory" for April 23, 2008, on a page titled "Institute for Creation Research Process Update to Grant a Certificate of Authority":

**What happens if the recommendation is to approve ICR's request for a COA** [i.e., a "Certificate of Authority" to grant *M.S.* degrees in "Science Education"] **?**

Association of Christian Colleges and Schools ("TRACS", see www.tracs.org ), or Distance

Education Training Council ("DETC", see www.detc.org ), or Association for Biblical Higher

Education ("ABHE", see www.abhe.org ), or no private sector accreditation at all.   Although

Texas statutes permit THECB to recognize accrediting associations besides SACS, THECB has

only authorized SACS to offer graduate-level science education degrees in Texas, which

provides SACS-affiliated colleges and universities with a market monopoly that clashes with

federal and Texas constitutional principles.

42.     In short, as a matter of free speech liberty law, the State of Texas should *not* lend its

governmental powers (via THECB) to a ***private special-interest group***, such as SACS,[28] *to*

*reduce competition within the science education "market",* as a governmental "favor" to the

popular science community (i.e., the evolutionary establishment), just because evolutionary

theory is currently the most popular theory within the overall scientific community (and within

SACS).   Using color of state government law, as defendants have done (to ICRGS's ongoing

---

> If the Commissioner's recommendation is to approve ICR's request for a Certificate of
> Authority, and the Board votes to affirm, then ICR will have gained the legal authority to
> begin offering the proposed Masters of Science Education [*sic*] degree to their students.
> **The ICR must then begin the process of obtaining accreditation from the Southern**
> **Association of Colleges and Schools.**  The ICR must apply to renew their COA every 2
> years for a maximum of 8 years from the original date of issuance and must show
> continuous progress in achieving accreditation during that time. [*emphasis added*]

This THECB-mandated favoritism of **SACS**, at the expense of TRACS, DETC, and ABHE, or
no accreditation at all, is an ***improper delegation of governmental power to a private entity***. *See*
*generally, accord,* Texas Boll Weevil Eradication Foundation v. Lewellyn, 952 S.W.2d 454,
470—472 (Tex. 1997), *as clarified in* FM Properties Operating Co. v. City of Austin, 22 S.W.3d
868, 873—874, 887—888 (Tex. 2000).   *See also* THECB's unchecked discretion, under Texas
Education Code § **61.003(13),** regarding THECB's regulatory "recognition" (i.e., licensing-like
approval) of college accrediting agencies.

[28] See, e.g., postsecondary education "market"-favoring reference to **SACS** in the following
Texas laws:  Texas Education Code § **61.003(13)** & § **61.003(15).**

---

injury), restrains legitimate competition in the higher education market, and thus runs afoul the "rule of reason" norm for recognizing unfair trade restraints, such as those prohibited under federal antitrust laws. (*See* Dr. Randy Guliuzza's "Consensus Science: The Rise of a Scientific Elite" in ***ACTS & FACTS***, volume 38, issue 5 (May 2009), pages 4-6, now posted at www.icr.org/articles/print/4590 .)  The more important point here is not the technical application of the antitrust laws as much as it is the failure of such governmental process to properly accommodate the freedom rights of ICRGS, which are limited to seeking SACS "accreditation".

43.     Consequently, due to the manner in which defendants use their color of offices (at the THECB), THECB has produced a *de* facto governmental delegation of monopolistic "accrediting-of-accreditors" power, as is shown by the THECB's website-posted "press release" of April 23rd of 2008 shown how THECB has chosen to limit accreditation to SACS, producing an accreditation gate-keeping condition that arguably runs afoul federal and/or Texas law.  The customary policy and practice of the THECB, under color of Texas law, involves the THECB accrediting accreditors such that bona fide accrediting agencies are shut out of Texas, even if an accrediting agency is listed as "recognized' or "approved" by the U.S. Department of Education.

44.     Accordingly, ICRGS now seeks a declaratory judgment (and injunctive relief to effectuate same, binding on defendants **and their successors in office**) that the Texas statutory scheme of accrediting accreditors is facially and/or applicationally <u>unconstitutional</u>, as a **monopoly-promoting interference with and restrain on interstate commerce.**   There is no constitutionally legitimate reason why THECB insists that only SACS can "accredit" a Science Education program offered and operated in Texas by a private postsecondary educational institution.   There is no constitutionally valid rationale for THECB rejecting the accrediting

services of DETC or TRACS or ABHE.[29]  Constitutionally speaking, approval by a "accrediting

association" should not be required for any school to express its good-faith *assessment* of its

students (as having earned academic degrees), so long as those degrees as not a "sham" resulting

from "degree mill" operations.  This should apply to defendants' actions as state officers, under

color of state law, labeling a graduate science education program as **"fraudulent or**

**substandard"** simply because that *private sector* graduate school accused Darwin (and

Darwinists) of being "wrong" and accordingly presented the teaching of sciences of geology,

biology, physics, and general science from a Biblical creationist viewpoint.[30]  Under the control

of defendants' concerted actions at THECB, under color of state law, THECB's historic usage of

SACS as its "agent" supports the idea that **SACS** has "monopoly power" in the State of Texas

higher education market.  In other words, as a governmental (licensor) "gate-keeper", THECB

can intentionally combine forces (and share regulatory powers) with a *favored* special-interest-

affiliated associate **(such as the local "regional accrediting association", i.e., SACS)**, to

monopolistically "tilt" the educational market for graduate science education market

opportunities.  This occurred in ICRGS's case, at least in 2 aspects of the license-denial process:

> **(1)**      defendant Paredes chose to select *ex parte*  advisory committee panelists who
>
>        belong to SACS-accredited schools, despite the statutory requirement that

---

[29] Transnational Association of Christian Colleges and Schools ("TRACS", see www.tracs.org ), or Distance Education Training Council ("DETC", see www.detc.org ), or Association for Biblical Higher Education ("ABHE", see www.abhe.org ).

[30] Tilton v. Marshall, 925 S.W.3d 672, 678—679 (Tex. 1996) (no legal claim of **"fraud"** can be made,  by the State of Texas government, if that claim depends upon the state evaluating the truth or legitimacy of a particular *religious opinion*).  ***Regarding the problem of deception in evolutionary science, see also*** James J. S. Johnson, Jeffrey Tomkins, & Brian Thomas' "Dinosaur DNA Research:  Is the Tale Wagging the Evidence?" in *ACTS & FACTS*, volume 38, issue 10 (October 2009), pages 4-6, now posted at www.icr.org/article/4947 .)

---

government agencies only compose "advisory committees" which are "balanced" in composition, including advisors from the relevant provider "industry" and advisors from the relevant "consumer" market; and

**(2)**     the THECB's own website says that ICRGS would be required to pursue SACS accreditation *just to keep its degree-granting license*, if ICRGS were to ever get such a license from the THECB.

Accordingly, government power-enabled favoritism of SACS was used in 2008, and continues to be used today, to manipulate a SACS-favored governmental licensing of the postsecondary science education market in Texas (including the private sector portion of that market), in a manner that resembles a "vertical" form of improper trade restraint.

45.     This favoritistic arrangement is a realistic concern for ICRGS, when analyzing the overall restraint-of-trade situation (applicable to the Texas market for providing graduate science education programs), due to the THECB's behavior in the <u>HEB Ministries</u> controversy (cited elsewhere in this petition).   Commissioner Paredes' prior misuse of his state office (as THECB's CEO), as reflected in THECB's unconstitutional behavior in the <u>HEB Ministries</u> controversy, included his unconstitutional *academic-vocabulary-censoring* actions under color of state law.

46.     In particular, defendant Paredes constituted the ultimate *ex parte* "panel" advisors in the form of an improperly composed advisory committee, so that the unbalanced advisory committee functioned as a team of "private interested parties", to squeeze ICRGS out of the "market".

47.     Behind the gate-keeping and ostracism semantics, which were used publicly by defendants prior to and during April 2008, the material fact remains that defendants have actively facilitated SACS as being the *only* "approved" (i.e., licensed in Texas) accrediting association with monopoly power over any **graduate-level   science   education   degrees** issued in Texas.

Revealingly, THECB (as operated by defendants under color of state law) disallows the same privileges to **TRACS**, a creationist college accrediting association which is approved by the U.S. Department of Education. This further shows defendants' anti-creationist discrimination, under color of state law, as embodied in official THECB policy and practice. Creationist colleges (such as TRACS-accredited colleges) receive adversely disparate **treatment** (as well as adversely disparate **impact**) in Texas, due to THECB's ongoing institutional custom of discriminating against colleges with a Biblical creationist viewpoint. Just because the politically influential evolutionary establishment, using THECB-aided monopoly tactics, tries to redefine creationist scientists as "non-scientists" (and/or as "religionists" *per se*, simply because most creationists have specific religious viewpoints), does not negate the "elephant-in-the-room" reality that creationists routinely teach and routinely practice real-world science,[31] and that history irrefutably proves that real-world "science" did *not* originate with Charles Darwin.[32]

48.    In sum, the semantic redefinition of "science", to shut out all creation science-informed science education programs, constitutes the promotion of a higher education monopoly, and such misuse of government power "shall never be allowed" in Texas, according to the Texas

---

[31] Showing defendants' arbitrary and discriminatory bias, the joint committees of the THECB were reminded, on April 23rd of 2008, but apparently ignored, that even American astronauts take **Genesis 1:1** seriously, yet such creaturely reverence does not *per se* magically transmogrify a science-trained astronaut into a science-deprived religionist! (Neither does a creaturely reverence for the Creator magically convert an F-16 pilot into a science-deprived ignoramus.)

[32] Documented observations of the world of nature antedate the 1800s, obviously, yet many of those eye-witness-based observations clash with the imagined world that evolutionist theorists anticipate. *See, e.g.,* Steve Austin, "Ten Misconceptions about the Geologic Column" (**www.icr.org/article/242/** ), orig. publ. as ICR *Impact* (11-1-1984); Bill Cooper, "Living Dinosaurs from Anglo-Saxon and Other Early Records", *Creation Ex Nihilo Technical Journal* 6(1):49—66 (1992), *reprinted within* Bill Cooper, *After the Flood* (Chichester, England: New Wine Press, 1995), pages 130—161, *cited in* **Progress Report's Appendix T.**

---

Constitution's Bill of Rights.[33]    Yet, if the defendants' actions, under color of state law (including THECB's decisions), is not actively annulled by this or a higher tribunal, a *de facto* monopoly in the science education market is facilitated by the defendants' favoritistic (and discriminatory) actions.  And, as indicated below, said monopolistic restraint on trade, in science education, interferes with interstate commerce, yet another unconstitutional result.[34]

## X.  THECB-IMPOSED "PRIOR RESTRAINT" ON ICRGS ACADEMIC SPEECH

49.    Of special relevance to ICRGS's case, therefore, is that THECB (as led by defendants, under color of state law) publicly provided no *meaningful legal analysis* with respect to causing potential injuries to ICRGS from any unconstitutional **"prior restraint"** censorship resulting from THECB's processing of ICRGS's application for a Certificate of Authority.[35]    Likewise, THECB (as led by defendants, under color of state law) publicly provided no concern or care about "balanced representation" with respect to causing potential injuries to ICRGS from any unconstitutional **"prior restraint"** censorship resulting from THECB's processing of ICRGS's application for a Certificate of Authority.   In any case, the action used by defendants, to use the machinery of state government, to deny ICRGS a degree-granting license, did involve

---

[33] Texas Constitution, Article 1, § 26 ("perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed . . . . ").

[34] *See, accord,* James J. S. Johnson, "Censorship in Texas: Fighting Academic and Religious Discrimination", in ***ACTS & FACTS,*** volume 38, issue 5 (May 2009), pages 18-19, *especially federal and Texas state case law quoted and/or cited therein.*

[35] Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734 (1965) (mandating limits on "prior restraint" regulation on public speech, while recognizing dangers of a licensing process that could operate as a censorship system), *quoted in and clarified by* Thomas v. Chicago Park District, 534 U.S. 316, 320—322, 122 S.Ct. 775, 776—779 (2002).

defendants' improper acceptance and repeated "rubber-stampings"[36] of the *ex parte* "panel" advisors' intolerant anti-creationist discrimination, which discrimination was accepted, adopted, and practiced by the defendants, as they acted to impose a "prior restraint" on ICRGS's academic (degree-granting) speech.  Some "prior restraints" are constitutionally warranted, but not here.

## XI.    SUBSTANTIVE FEDERAL LAW CLAIMS

50.    ICR (acting via its educational ministry unit ICRGS) hereby requests relief from its past and ongoing injuries, pursuant to federal statutory laws which provide remedies for civil rights violations committed under color of state law, e.g., the Civil Rights Act codified at 42 U.S.C. § 1983  (which law applies to the defendants who are "persons", for their respective civil rights violations (which are noted herein), in conjunction with the federal Declaratory Judgment Act.

51.    Under the **U.S. Constitution's** 1st & 14th Amendments (including the textual parts and judicial applications therefrom regarding ICRGS's academic speech, freedom of the press, free exercise of religion, Due Process, Equal Protection, etc.), ICRGS's constitutional civil rights should have been be recognized and respected by defendants (**but were not**), including:

(a)    any regulation/chilling of ICRGS's "academic speech" must be strictly and constitutionally justified (to avoid "**viewpoint discrimination**"), and

(b)    any regulation/chilling of ICRGS's "commercial speech" must be constitutionally justified (under applicable case law), and

(c)    any regulation/chilling of ICRGS's hybrid "religious speech" must be constitutionally justified (under case law governing "religious speech" / "hybrid speech"); and

---

[36] *See* Wilmer-Hutchins I.S.D. v. Brown,  912 S.W.2d 848, 850-851  (Tex. App. – Austin 1995, writ denied).  *Accord, see* Flores v. Employees Retirement System of Texas,  74 S.W.3d 532, 538—540  (Tex. App. – Austin 2002, *petition denied*).

(d)    any regulation/chilling of ICRGS's "religious" speech must be constitutionally justified (to avoid violation of Free Speech and/or Free Exercise religious liberties); and

(e)    any "prior restraint" of ICRGS's academic "speech" or "press" (catalogs, brochures, *ACTS & FACTS* ads, website) must be constitutionally justified, avoiding "excessive entanglements", under case law governing **"prior restraint"** limitations; and

(f)    any regulation/chilling of "academic speech" must also avoid running afoul the Equal Protection and Due Process clauses of the 14th Amendment (with "Due Process" being informed by the 5th Amendment), and these procedural norms should accompany any/all quasi-judicial processes for ICRGS's application for a license to grant its proposed M.S. degrees; and

(g)    any state regulation which requires ICRGS to relinquish its federal 1st & 14th Amendment—protected rights[37] should be recognized as an unjustified violation of Due Process (and/or as an uncompensated "taking" of ICRGS's property and/or liberty interests); and

(h)    when interpreting ICRGS's 14th Amendment-protected liberty interests, the historical importance and anti-monopolistic policy of the U.S. Constitution's Titles of Nobility clause (Art. 1, § 9) should not be ignored.

## XII.   SUBSTANTIVE TEXAS STATE LAW CLAIMS

52.    Pursuant to federal laws which allow for "pendent" (or "supplemental") state law-based claims, ICR (acting through ICRGS) hereby requests relief under Texas state laws cited herein.

53.    Under the **Texas Constitution**, Article 1, sections 1, 3, 3a, 6, 8, 13, 19, 29, ICRGS's civil rights should be recognized and respected by defendants (but were not), including the following:

---

[37] See <u>Dolan v. City of Tigard</u>, 512 U.S. 374, 385—386, 114 S.Ct. 2309, 2316—2317 (1994), *following* <u>Nolan v. California Coastal Commission</u>, 483 U.S. 825, 107 S.Ct. 3141 (1987).

(a)    any hindrance or chilling of ICRGS's "academic speech" must be strictly and constitutionally justified (to avoid "viewpoint discrimination"), due to Art. 1, § 8 ("**liberty to speak, write or publish** his opinions on any subject"), and

(b)    any hindrance or chilling of  ICRGS's "commercial speech" must be constitutionally justified (under applicable case law), due to Art. 1, § 8 ("no law shall be passed curtailing **the liberty of speech or of the press**"), and

(c)    any hindrance or chilling of ICRGS's "**hybrid speech**" must be constitutionally justified (under case law governing "hybrid speech") especially in light of Art. 1, § 6 in conjunction with § 8; and

(d)    any hindrance/chilling of ICRGS's  "religious" speech must be constitutionally justified, to avoid violating the Equality Under the Law clause protecting "creed" liberties (Art. 1, § 3a), and to avoid governmental acts that "control or interfere with **rights of conscience in matters of religion**" (Art. 1, § 6); and

(e)    any **"prior restraint"** of ICRGS's "press" (catalogs, brochures, website) must be constitutionally justified, under case law governing "prior restraint" of printed or electronic publications, due to Art. 1, § 8 ("**liberty to speak, write or publish his opinions on any subject**", and ("**no law shall be passed curtailing the liberty of speech or of the press**"); and

(f)    any hindrance or chilling of ICRGS's academic speech should also avoid running afoul the **Due Course of Law** provisions of Art. 1, § 13  &  Art. 1, § 19, and also in light of the **Equality** provisions of Article 1, § 3 &  Art. 1, § 3a, --  and these procedural norms (which norms should include complying with the "balanced representation" mandate of **Texas Government Code § 2110.002**, when composing an advisory committee to advise THECB

---

and/or its Commissioner) should accompany all quasi-judicial processes for ICRGS's application for a license to grant its proposed *M.S.* degrees in "Science Education"; and

(g)    interpreting and protecting ICRGS's **"Due Course of Law"** rights should included proper consideration of the historical importance and policy of the Texas Constitution's expressed concern for **reputational injury** (Art. 1, § 13), as well as the **Public Emoluments and Equal Rights** clauses (Art. 1, § 3), and/or the **anti-monopoly policy** of Art. 1, § 26.

54.    To the extent that the phrase "district court", as the phrase "district court" used in Tex. Civ. Prac. & Rems. Code § **110.005(c),** may include this <u>federal</u> district court, ICRGS requests relief herein under the Texas RFRA of 1999.

55.    Also, another form of statutory relief ICRGS deserves, under Texas law, is relief from religious discrimination, under color of state law (by defendants misusing their THECB offices and powers) under Tex. Civ. Prac. & Rems. Code, § 106 **("Discrimination Because of Race, Religion, Color, Sex, or National Origin"),** which lists various "prohibited acts", including:

(a)    in § 106.001(1), as including a refusal "to issue to the person a license, permit, or certificate", and

(b)    in § 106.001(4), as including a refusal "to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state"; and

(c)    in § 106.001(5), as including a refusal "to grant a benefit to the person"; and

(d)    in § 106.001(6), as including a refusal "to impose an unreasonable burden on the person".

The Texas statute-based remedies, available under Tex. Civ. Prac. & Rems. Code § 106, for such discrimination-caused civil rights violations, include:

(a)    under § 106.002(a), "preventive relief, including a permanent or temporary injunction, a restraining order, or any other order"; and

(b)    under § 106.002(b), "reasonable attorney's fees as a part of the costs".

## XIII.  CLARIFICATIONS REGARDING RELIEF SOUGHT HEREIN

56.    Clarity is needed when considering the potential relevance of federal case law involving the promotion of creationism (or secularized "intelligent design" science) as content for public school curricula and/or in public school textbook disclaimers. ICRGS's case is **not** a controversy involving any public school "entanglements"!  ICRGS is not seeking to impose its creationist viewpoint distinctives on any *public* school or college.   (This point contrasts with Dr. Skoog's fault-finding that ICRGS's curriculum would be unacceptable for any Texas **public** university.)

57.    In short, to the extent permitted under Texas state laws adjudicated by this honorable Court, ICRGS respectfully requests appropriate injunctive relief (including preliminary injunctive relief, whether with or without a "structured" injunction), declaratory relief, Texas Public Information Act-based relief, attorneys fees, and costs of court.  Eventually, ICRGS hopes to gain injunctive relief that includes required remedial education for defendants, via a Court-monitored "diversity training" attendance requirement (on viewpoint discrimination and other aspects of 1st and 14th Amendment law, e.g., State bar of Texas-credentialed CLE courses).

58.    Likewise, notwithstanding certain remarks to the contrary (during THECB proceedings in April 2008), it is error to say or suggest that the U.S. Supreme Court has dispositively ruled that "creation science" is not real "science" because it is (or it simultaneously involves) "religion".[38]

---

[38] This would be like saying that a husband ceases to be a husband if and when he becomes a father, or like saying that a wife ceases to be a wife if and when she becomes a mother.  (It is possible to be one without the other, or to be both at the same time.)  ICRGS does not cease being a competent and qualified provider of graduate-level *science* education *ipso facto* when

It is true that the U.S. Supreme Court has struck various statutes perceived as vehicles for "restoring-Biblical-creation-to-the-public-schools",[39] but ICRGS is neither a public school not a private school seeking government money! Accordingly, all precedents that deal with mandating or prohibiting creation science (or even "intelligent design" science) in the **public** schools" are inapposite to this petition's legal concerns.    Furthermore, it is wrong to say that the federal courts have dispositively defined "creation science"    as    non-science.    (And, public media "scholarship" aside, popular dictionaries are not authoritative sources for defining what "creation science" really is.)    It is correct, however, to say that federal courts have recognized that creation science presupposes a religious belief in a Creator God, but the existence of that religious belief does not *ipso facto* disqualify (or exterminate) the underlying scientific model, methodologies, and practices of "creation-science" as a legitimate form of real science: "Nothing in our opinion today [in 1985] should be taken to reflect adversely upon **creation-science** *either* **as    a**

---

ICRGS demonstrates that it has a Biblical *creationist* viewpoint.    ICRGS is simultaneously a graduate-level science education provider, and a Biblical creationism viewpoint advocate.    The U.S. and Texas Constitution allow scientists to hold religious viewpoints; scientists (and science educators) should not be deemed to **forfeit** their identities (or their **vocational callings**) as scientists (and science educators) just because they recognize God's handiwork in nature. Defendants should recognize its duty to accommodate such beliefs.

Also, the rights of the ICRGS faculty, to teach apart from governmental persecution of their religious viewpoints, likely involves the "Privileges and Immunities" and/or "Equal Protection" clauses of the 14th Amendment, since those clauses often applies to liberty and equity regarding vocational opportunities. *See, accord,* Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10 (1915) (saying, after noting that no public funding was involved: "[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14[th]] Amendment to secure").

[39] Public schools, especially those which enforce compulsory attendance laws, are not a convenient vehicle for mandating Biblical creationism teachings, taught to public school students (who are legally compelled to attend school) by public school-teachers, many of whom disagree with Biblical teachings. *See, accord,* Edwards v. Aguillard, 482 U.S. 578, 584, 107 S.Ct. 2573, 2578 (1987), *citing* Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275 (1981).    But private schools have no such "Establishment" entanglements.

---

*religious* **belief** *or a scientific* **theory.**" *Quoting from* <u>Aguillard v. Edwards</u>, 765 F.2d 1251, 1257, 26 Educ. Law Reptr. 29 (5th Cir. 1985) (emphasis added). *See also, accord,* Justice Scalia's dissent in <u>Aguillard v. Edwards</u>, 482 U.S. 578, 611, 107 S.Ct. 2573, 2592 (1987), recognizing a statutory definition of "creation-science" as "the *scientific evidences* for creation and inferences from those *scientific evidences*" (emphasis in original). Justice Scalia further described creation-science as "essentially a collection of scientific data supporting the theory that the physical universe and life within it appeared suddenly and have not changed substantially since appearing". *Quoting* <u>id.</u>, 482 U.S. at 612, 107 S.Ct. at 2592.

59.    This case is *not* about granting master's degrees to *undergraduate* students who only study low-level, memorization-based science courses for a year or two. This is not a *"degree mill"* for "fraudulent or substandard" degrees, unless that phrase is deemed to apply to anyone who fails to "believe in their heart" that naturalistic evolution is true.[40] It should suffice that ICRGS has set forth relevant curriculum and qualified instructors, who are prepared to transmit educational content in good faith unto qualified students who voluntarily seek to master that educational content from a conspicuously creationist graduate school. ICRGS, since 1981, has practiced educational quality, academic rigor, quantitative analysis, empirical research (including field studies, controlled experiments, and "high-tech" investigation of nature, e.g. scanning electron microscopy, helicopter investigations of Mount St. Helens, etc.), forensic logic and analysis, within good-faith academic freedom parameters, and has done so all from a Biblical and scientific creationism viewpoint. Because ICRGS has set forth relevant curriculum and

---

[40]  The official utterances of defendants, especially on April 23rd (and 24th) of 2008, demonstrate the defendants' adamant opinion, expressed as government officials, that any private institution (even one that receives no state government funding) may not have a license to offer a Master of Science degree in Science Education if that private institution expresses the viewpoint that "Darwin was wrong" and the earth is "young".

qualified instructors, prepared to transmit educational content to qualified students who voluntarily seek to master that educational content from a conspicuously creationist graduate school, that should suffice, in Texas, regardless of the uncomfortable fact that ICRGS affirms and teaches a *minority* viewpoint about cosmic and human origins and the worldwide Flood.

### XIV.  SOME DECLARATORY RELIEF QUESTIONS.

60.    This suit requests declaratory relief that would answer the following civil rights-oriented questions, as such are applicable to ICRGS's situation:

(a)    Are Biblical creationists (like ICRGS) really allowed to "freely" exercise their religious viewpoints in their graduate Science Education programs,   --   or may defendants use their THECB powers to ban (or otherwise punish) such religious viewpoints?

(b)    Are young-earth creationists (like ICRGS) really allowed to teach an academic viewpoint of recent creation and a global Flood some 4½ thousand years ago,   --   or may defendants use their THECB powers to ban (or otherwise punish) such  viewpoints?

(c)    Are Biblical creationists (like ICRGS) allowed to offer Master of Science degree programs (in a manner that includes the "free speech" of ICRGS's faculty expressing the ultimate educational assessment *opinion* that a particular graduate student has earned a "Master of Science" degree "in Science Education"),[41]   --   or may Biblical creationists

---

[41] In Texas every science educator (whether he or she be an evolutionist, a creationist, or an "intelligent design" proponent) should be recognized as *legally entitled to express*, in the words of Article 1, § 8, of the Texas Constitution, **"his opinions on any subject"**.    And, commensurate with a demonstration of good faith, academic freedom should likewise guide any inquiry, in Texas, about which schools should be free from a "prior restraint" regarding offering graduate science education programs (which is provided from a Biblical creationist viewpoint), -- including the academic right to express good faith "opinions on any subject" (to quote from the Texas Constitution's Article 1, § 8), including the academic right to express ultimate educational assessment opinions about whether and when a given graduate student has (or has not yet) satisfactorily completed a Master of Science degree in Science Education.

---

(like ICRGS) be **"expelled"** from the academic **"bus"** by defendants (because there is "no intelligence allowed" in science education)?

(d)    Or, if Biblical creationists (like ICRGS) are allowed to teach science education from a creationist viewpoint (via online courses, labs, and field studies),  --  must they do so from **"the back of the** (academic) **bus"**, as defendant Paredes has proposed, by calling such graduate degrees a "Master of Creation Studies" or a "Master of Creation Research", using a **"separate but equal"** rationalization?

## XV.   CLARIFICATION FOR ICR'S VIEWPOINT-BASED PRIORITIES

61.    In particular, ICR's minority viewpoint, which is sincerely and institutionally held by ICR (and thus also by ICRGS), impacts ICR's ability to "freely exercise" its religious and scientific viewpoints, which include its sincerely held beliefs that:

(a)    the Great Commission of Matthew chapter 28 is obligatory;

(b)    Genesis 1:1 is foundational truth about God, and its truth is thus foundational for honoring Him as such, as opposed to failing to do so "without excuse";

(c)    "science" should not be taught from an "atheistic-evolution-only" perspective (because that perspective is false and should be avoided, according to **1st Timothy 6:20**);

(d)    the supposedly "foundational" notion that an evolutionary "Big Bang" occurred "14 billion years ago", which notion Commissioner Paredes officially endorsed (on April 23rd or 2008), is a false notion that is "science falsely so-called"; and

(e)    science education should emphasize the geologic importance of the Genesis Flood, due to its unique worldwide impact on earth's history.

62.    The defendants' actions (prior to, on, and after April 24th of 2008) have not pursued academic degree regulation via "legitimate" interferences that are **"least restrictive"** (or "least burdensome") of ICRGS's constitutional (or statutory) rights.  (*See, accord,* <u>Barr v. City of Sinton</u>, 2009 WL 1712798 (Tex. 2009).)  The preceding paragraph's five points specially relate to this litigation, especially as expanded in the next four points:

(a)    <u>**ICRGS is defending its academic freedom to obey the Great Commission**</u>
       <u>**by academically  teaching and assessing the learning of its viewpoint.**</u>
       ICRGS seeks to protect its academic freedom rights to teach in a way that obeys the Great Commission. (Part of *teaching* is *assessing* the learning of the learners, and that is ultimately what an academic degree is, an *opinion* of educational assessment.) ICRGS sincerely believes that the core of the Great Commission is *teaching* the teachable how to honor and obey our Creator and Redeemer, the Lord Jesus Christ.  That is what ICRGS has been doing since 1981.  ICRGS's dispute with the THECB is not a about a mere "cheek-slap" insult.  It is about a serious violation of ICRGS's constitutional rights to "freely exercise" its academic freedom and its religious viewpoint to teach in a way that obeys the Great Commission.

(b)    <u>**ICRGS is defending its academic freedom to intelligently and privately**</u>
       <u>**teach what Genesis 1:1 is all about.**</u>    ICRGS sincerely believes that God has chosen to define Himself, foundationally, as our Creator:  the very first verse in the Bible reveals God as our Creator.  God's Creatorship is foundational to every other truth we will ever learn.    ICR's Graduate School has been intelligently and <u>privately</u> teaching what that verse means since 1981.  It is unconstitutional for THECB to ban or even disfavor ICRGS teaching that truth in a <u>private</u> education context, unsubsidized by

government funding. (All of the "public school" legal controversies about mixing "church and state" are *irrelevant* to what ICRGS teaches *privately*.)

**(c)**    **ICR is defending its civil rights to teach a non-atheistic view of "science".**

ICRGS seeks to protect its academic freedom rights to teach in a way that obeys the Dominion Mandate, which teaching necessarily includes ICR's teaching its sincerely held (non-atheistic) religious belief that God mandated various stewardship responsibilities to humans (via the Dominion Mandate and otherwise). ICR, for ~ 40 years has produced real SCIENCE. To not resist the THECB would appear to concede that what ICR has been doing, all these years, was not real "science". THECB claims the regulatory power and right to define "science" as limited to **evolution-only** views of science. Also, THECB wrongs ICR's reputation by saying that its graduate program is "fraudulent or substandard". This is not a problem limited to ICR: current federal court litigation includes the case of ACSI-credentialed Christian schools across America suffering "***EXPELLED***"-style discrimination by the California state college and university system, yet another example of the growing trend of ***evolution-only*** gate-keeping segregating Bible-believing Christians to the "back of the bus" or excluding Christians from the academic "bus" altogether.

**(d)**    **ICR is protesting the Texas government agency's "established" partiality regarding religious viewpoints that clash with the Bible.** Under our American system of checks-and-balances, and the "rule of law" (as opposed to cronyistic favoritism and "establishment"-like favoritism of an incumbent official's religious viewpoints), state government agencies have an obligation not to use government power to favor or disfavor a religious viewpoint when performing government functions. Yet

Commissioner Paredes specifically justified his denial of rights to ICRGS on Commissioner Paredes' belief that the cosmos began with a "Big Bang" 14 billion years ago, and that evolution is "foundational" to "modern science" and "science education". ICRGS sincerely believes that Commissioner Paredes' viewpoint regarding a "Big Bang" is wrong. Commissioner Paredes has the political right to reject the Holy Bible's description of creation, but he does not have the right to impose his religious views (or the views of an *ex* parte committee of evolutionist "advisors") upon ICR or upon its educational constituents, nor does Commissioner Paredes have the right *to condition ICR's right to receive a government license* on whether ICR accepts his religious viewpoint. (The same juristic logic also applies to the other defendants.)

Therefore, constitutionally speaking, THECB's ongoing denial of ICRGS remains (until cured) an unconstitutional burden impairing ICRGS's academic freedom and religious liberties.

## XVI.   RELIEF REQUESTED

WHEREFORE, premise considered, ICRGS hereby respectfully requests the following forms of relief, to be entered against the THECB, and/or against the other above-indicated defendants in their official capacities, consistent with anti-discrimination civil rights law (applied, where need be, in accordance with *Ex parte Young* doctrine and statutory applicability[42]):

A.    Injunctive Relief, including preliminary and permanent injunctive relief, including a structured injunction if just and proper, with said injunctive relief including both mandatory and prohibitory **remedial** relief components. Such injunctive relief should include provisions that require THECB's Commissioner, in his official capacity as the

---

[42] ***E.g.,*** remedial relief under 42 U.S.C. § 1983 is only requested as to the defendants who are statutorily deemed "persons".

CEO of the THECB, to mitigate and undo the defendants' discriminatory actions by promptly **approving and granting** ICRGS a Certificate of Authority to grant **Master of Science** degrees in *Science Education*, with optional minors in *Biology*, *Geology*, *Astro-geophysics*, and *General Science*.

B.    Declaratory Relief ancillary to the Injunctive Relief, pursuant to the Federal Declaratory Judgment Act (codified at 28 U.S.C. § 2201), including a declaration that **Subchapter G of Chapter 61 of the Texas Education Code** is facially unconstitutionally restrictive, burdensome, vague, and/or overbroad, and is thus null and void, --- or, alternatively, that said Subchapter G of Chapter 61 has been **unconstitutionally applied** to ICRGS (in a manner violative of the First and Fourteenth Amendments to the U.S. Constitution, as well as violative of similar provisions of the Texas Constitution), -- insofar as said Chapter 61 of the Texas Education Code purports to exercise jurisdiction over academic degree-granting or other operations of private sector postsecondary educational institutions, including ICRGS (as well as any other postsecondary educational unit of ICR). In particular, provisions of the declaratory relief to be granted should include a judicial declaration that the THECB has **no** regulatory jurisdiction over private higher educational institutions, including ICRGS, unless those institutions accept state government funding or state government-administered funding.[43]    (This declaration could, but need not be based on a declaration that Texas enabling statutes are unconstitutional if they permit the THECB to interfere with academic freedom of

---

[43] *See, accord,* Texas Education Code, **§ 1.001(a)** ("This code applies to all educational institutions supported in whole or in part by state tax funds unless specifically excluded by this code"). This qualification shows that the Texas Education Code, including all powers the THECB's Commissioner derives from that code, do not apply to ICRGS (or any other ministry unit or activity of ICR).

educational institutions which do not receive government subsidy funding.)    Moreover, in light of the "catch—all" regulatory power colorably provided by Texas Education Code § 61.3021, THECB's regulatory limitations (as well as any Texas statutes which attempt to delegate unto THECB regulatory powers via constitutionally improper delegations) should be quasi-judicially and/or judicially delineated, in order to quash the "chilling effect" of *ultra vires* regulatory activities (such as those which were the subject of the above-noted HEB Ministries litigation).    Furthermore, this need for jurisdictional clarification regarding "academic speech" (subject to constitutional law requirements) is particularly important in light of Texas statutes that cross-reference the THECB's enforcement powers to "deceptive trade practices" statutes.[44]    Furthermore, declaratory relief should indicate that said Chapter 61 has been unconstitutionally applied to ICRGS (in a manner violative of the First and Fourteenth Amendments to the U.S. Constitution, as well as violative of similar provisions of the Texas Constitution),    --    insofar as said Subchapter G of Chapter 61 of the Texas Education Code purports to exercise jurisdiction over academic degree-program-**accrediting** or other operations of private sector postsecondary educational institution **accreditors**, including but not limited to TRACS, ABHE, and DETC.[45]    In particular, provisions of the declaratory relief to be granted should include a judicial declaration that the THECB has **no** regulatory jurisdiction over    **private sector accreditors** (i.e., "accrediting associations" or

---

[44] *See, e.g.,* Texas Education Code § 61.320 ("**Application of Deceptive Trade Practices Act**") and Texas Education Code § 61.321 ("**Information Provided to Protect Public from Fraudulent, Substandard, or Fictitious Degrees**").

[45] Transnational Association of Christian Colleges and Schools ("TRACS", see www.tracs.org ), or Distance Education Training Council ("DETC", see www.detc.org ), or Association for Biblical Higher Education ("ABHE", see www.abhe.org ).

---

"accrediting agencies", including but not limited to TRACS, DETC, and ABHE) of any underlined private higher educational institutions, (including ICRGS), unless those accreditors accept state government funding or state government-administered.[46]   (This declaration could, but need not be based on a declaration that Texas enabling statutes are unconstitutional if they permit the THECB to interfere with academic freedom of educational institutions which do not receive government subsidy funding.)   Moreover, in light of the "catch—all" regulatory power colorably provided by **Texas Education Code § 61.3021,** THECB's regulatory limitations (as well as any Texas statutes which attempt to delegate unto THECB regulatory powers via constitutionally improper delegations) should be quasi-judicially and/or judicially delineated, in order to quash the "chilling effect" of *ultra vires* regulatory activities (such as those which were the subject of the above-noted HEB Ministries litigation).    Furthermore, this need for jurisdictional clarification regarding "academic speech" (subject to constitutional law requirements) is particularly important in light of Texas statutes that cross-reference the THECB's enforcement powers to "deceptive trade practices" statutes. *See, e.g.,* Texas Education Code **§ 61.320 ("Application of Deceptive Trade Practices Act")** and Texas Education Code **§ 61.321 ("Information Provided to Protect Public from Fraudulent, Substandard, or Fictitious Degrees").**    Furthermore, as part of the declaratory relief[47] which ICRGS seeks, herein, whether under federal or state law, ICRGS requests a

---

[46] *See, accord,* Texas Education Code, **§ 1.001(a)** ("This code applies to all educational institutions supported in whole or in part by state tax funds unless specifically excluded by this code").   THECB's Commissioner Paredes thus has no Texas Education Code-based jurisdiction over ICRGS, over ICR's publications, or over any other aspect of ICR's operations.

[47] E.g., declaratory relief could include construing § 1.001(a) of the **Texas Education Code,** which says: "This code applies to all educational institutions supported in whole or in part by state tax funds unless specifically excluded by this code."

---

judicial declaration pertinent to Texas Education Code § 1.001(a) that substantially provides the following:

"Notwithstanding Subsection 61.303(d) or any other part of the Texas Education Code, a private educational institution (including a non-profit entity's separate degree-granting program "school" or "unit" or "college" or "institute") is exempt from Texas Higher Education Coordinating Board oversight if it:

(1) accepts no state government funding;

(2) is formed as or is part of a not-for-profit entity, whether incorporated or otherwise; and

(3) is not operated as a degree mill."

C.    Pendent jurisdiction-based Texas state law-grounded relief, e.g., under Tex. Civ. Prac. & Rems. Code, § 106 (**"Discrimination Because of Race, Religion, Color, Sex, or National Origin"**), and/or under the **Texas Religious Freedom Restoration Act of 1999**, codified at Tex. Civ. Prac. & Rems. Code, § 110.001 *et seq.,* and/or § **1.001(a)** of the **Texas Education Code** (including its incorporated-by-reference remedies under the Texas Declaratory Judgment Act), benefitting ICRGS, (1) including but not necessarily limited to an injunction ordering the defendants to issue ICRGS appropriate approval and licensing (i.e., a Certificate of Authority); and/or (2) a letter ruling from THECB (or a judicial decree equivalent, issued by this honorable Court), interpretively applying Texas Education Code § 1.001(a) and/or recently amended THECB Rule § 7.4(g), to indicate that THECB has no jurisdictional oversight over ICRGS's degree programs.

D.    Costs of Court, as allowed in conjunction with the injunctive relief-related statutes mentioned above (e.g., 42 U.S.C. § 1983).

E.    <u>Other Forms of Relief</u>, including a reasonable Attorney's Fee recovery (including expenses), as allowed under 42 U.S.C. § 1988, and/or in conjunction with declaratory relief awarded under 28 U.S.C. § 2201, and/or in conjunction with any state law-based grounds for attorney's fees (pursuant to Tex. Civ. Prac. & Rems. Code § 105.002 and/or § 106.002(b) and/or § 110.005(a)(4)), and/or other forms of relief as to which this plaintiff may be justly entitled, at law or in equity or otherwise.

**Respectfully  submitted,**

James J. S. Johnson, Esq.
Texas Bar # 10741520
Special counsel,  ICR Graduate School,
an unincorporated educational ministry unit of
**THE INSTITUTE FOR CREATION RESEARCH**
1806 Royal Lane, Dallas, Texas 75229
214-615-8314 telephone;  214-615-8299 FAX
Email: jjohnson@icr.org

Co-Counsel:

John A. Eidsmoe, Esq.
Iowa Bar # AT0002315
**FOUNDATION FOR MORAL LAW**
One Dexter Avenue, Montgomery, Alabama 36014
334-324-1245  telephone;  334-262-1708 FAX
Email: eidsmoeja@juno.com

## CERTIFICATE REGARDING SERVICE

I hereby certify that on the 12th day of October, A.D. 2009, I electronically filed the foregoing pleading (and the **Affidavit** attachment thereto, noted hereinbelow)  with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following attorney (and thereby to the Texas Attorney General's Office):

**Shelley Dahlberg, Esq.**
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
*Attorney of record for Defendants*

Certifying attorney for plaintiff

## ATTACHMENT:

## "1[st] Affidavit of Dr. Patricia Nason"

Signed and notarized July 6th, AD2009

(same affidavit originally filed in SOAH Docket # 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)